IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ROBERT CARL SHARP,<br><br>    Defendant. | No. CR15-0031<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

I.   *INTRODUCTION* ................................ 1

II.  *PROCEDURAL HISTORY* ......................... 2

III. *ISSUES PRESENTED* ............................ 2

IV. *RELEVANT FACTS* .............................. 3

V.  *DISCUSSION* .................................... 9
    A.  *Advice of Counsel Defense* .................. 9
    B.  *Factual Basis for Plea* ..................... 11
    C.  *Other Factors* ............................. 15

VI. *RECOMMENDATION* ............................ 16

## I. INTRODUCTION

On the 5th day of February 2016, this matter came on for hearing on the Motion to Withdraw Guilty Plea (docket number 173) filed by the Defendant on January 22, 2016, and the Resistance (docket number 183) filed by the Government on February 5. The Government was represented by Assistant United States Attorney Dan Chatham.

Defendant Robert Carl Sharp appeared personally and was represented by his attorney, Michael Lahammer.

## II. PROCEDURAL HISTORY

On March 31, 2015, Defendant was charged by indictment with conspiracy to manufacture and distribute a controlled substance (Count 1), possession with intent to distribute a controlled substance (Count 2), and possession with intent to distribute, and aiding and abetting the possession with intent to distribute, a controlled substance (Count 3). Defendant pled not guilty at his arraignment on April 6, and trial was scheduled before Chief Judge Linda R. Reade on June 1, 2015. At Defendant's request, the trial was continued to June 22, 2015, and again to October 5, 2015.

On October 4, 2015 — the day before trial was scheduled to begin — Defendant filed a notice of his intent to plead guilty to all counts contained in the superseding indictment.[1] At 8:00 a.m. on October 5, Defendant appeared before me and entered a plea of guilty to all counts. At that time, he was represented by attorney Joel J. Schwartz. I filed a report recommending that Judge Reade accept Defendant's guilty plea. Defendant waived any objections to the report, and Judge Reade accepted his guilty plea at 9:06 a.m. on October 5. The prospective jurors were then excused.

On December 31, 2015, attorney Michael K. Lahammer appeared on Defendant's behalf. Attorneys Joel Schwartz and Nathan Swanson were permitted to withdraw their appearances on January 21, 2016. On the following day, January 22, Defendant filed the instant motion to withdraw his guilty plea.

## III. ISSUES PRESENTED

Defendant asks that he be permitted to withdraw his guilty plea because his attorney at that time, Joel Schwartz, had an "actual conflict of interest." Defendant argues a

---

[1] A superseding indictment containing a technical change had been filed on September 22, 2015.

2

conflict existed with his attorney because Mr. Schwartz had previously advised Defendant that his conduct was legal. Nonetheless, according to Defendant, Mr. Schwartz did not discuss a potential "advice of counsel" defense, which would have required Mr. Schwartz to testify as a witness at the trial. Defendant argues Mr. Schwartz had an interest in not testifying because he potentially "could be charged with aiding and abetting the distribution of controlled substances if his legal advice was erroneous." Alternatively, Defendant asserts that a factual basis for his guilty plea was not established at the plea change hearing.

## IV. RELEVANT FACTS

Defendant operated a store in Iowa City known as "Pipe Dreamz." At the instant hearing, Defendant admitted he knew the products he was selling were being smoked. According to Defendant, he smoked them himself "on very few occasions." Defendant would not admit the products caused people to get "high" in the same way as marijuana, but conceded "it would cause a disorientation." Defendant admitted he knew his customers would use the product for that purpose. While Defendant attached a label which stated "not for human consumption," Defendant knew the product was, in fact, being consumed.

The controlled substance charged in the superseding indictment is AB-FUBINACA. Defendant claims, however, that he believed the substance being sold was THJ-011. Moreover, Defendant claims he believed the sale of THJ-011 was legal.

Joel Schwartz testified that he is an attorney based in St. Louis, Missouri. He has practiced for 27 years and has appeared in federal court in 20 or 30 jurisdictions. Schwartz estimated he had represented defendants in 5 to 15 synthetic drug cases, starting in about 2011 or 2012. Schwartz first met with Defendant regarding the sale of synthetic

3

drugs on December 16, 2013.[2] Defendant confirmed that he and Hadi Al Sharairei contacted attorney Joel Schwartz in late 2013 and paid him $12,500 each for advice on "what products they could sell in their store which were legal . . . and also what tactics the federal government would be using in cases where those substances weren't analogues or controlled substances."[3]

In a sworn affidavit introduced as Defendant's Exhibit B, Defendant stated that "[f]or a period of two years, Mr. Schwartz would inform us what products were legal to sell . . . and any new laws of relevance or tactics used by the federal authorities to prosecute persons selling herbal incense products." At the hearing, however, Defendant clarified that the reference to "a period of two years" was intended to mean *prospectively*. That is, for the $25,000 retainer, Schwartz would provide legal advice for two years beginning in late 2013. Defendant told Schwartz that he believed the substances being sold at his businesses were legal, but was concerned that earlier in the year persons around the country were being arrested and charged.

Schwartz met with Defendant two or three times prior to Defendant's arrest in May 2014.[4] After the initial consultation in December 2013, they met again when Defendant

---

[2] Schwartz represented Defendant "years ago" in an unrelated federal drug case.

[3] Schwartz could not recall whether Defendant was accompanied by Hadi Sharairei at that time.

[4] On February 18, 2005, Defendant was sentenced in the United States District Court for the Central District of Illinois to 180 months' imprisonment following his conviction for possession with intent to distribute crack cocaine. The sentence was later reduced to 132 months, and Defendant commenced a term of supervised release on April 2, 2012. A petition to revoke Defendant's supervised release was filed on May 7, 2014, and Defendant was arrested at that time. Defendant's supervised release was subsequently revoked and he was sentenced to 10 months in prison, with no supervised release to follow. Defendant was arrested on the instant charges following completion of that prison term.

4

brought in the retainer fee. Schwartz recalled sitting in his office and "discussing whether or not he should be selling this stuff and the answer was no. He did inquire with me about this THJ-011 and the answer was the same." Schwartz looked at the DEA website, but found no record of THJ-011 anywhere "and I told him so." Schwartz understood, however, that just because it wasn't listed anywhere "didn't mean it wasn't an analogue of something else out there." Schwartz denied ever telling Defendant that it was legal to sell THJ-011. However, Schwartz could not testify that he specifically told Defendant that it was illegal to sell THJ-011, instead cautioning Defendant that it was "too dangerous," and he should stop selling because "you're facing way too much time."

Schwartz and Defendant also discussed Defendant's packaging of the substances. Defendant believed that by labeling the packages "not for human consumption" it provided some "protection." Schwartz believed it would have the opposite effect, because it would constitute false labeling, potentially in violation of federal law. Apparently, Schwartz got into a "relatively heated argument" with an attorney in Florida who was advising people throughout the country to sell these products after labeling them "not for human consumption."

Defendant testified that Schwartz told him that THJ-011 was not a controlled substance and was not a controlled substance analogue. According to Defendant, he was also told by a chemical supplier that THJ-011 did not have a chemical structure similar to Schedule I or Schedule II controlled substances. Schwartz denied giving Defendant any advice regarding the legality of the substances being sold, except to tell him "this was too dangerous a game for him to play and he should stop." Defendant testified that attorneys Arthur Inman and Joe Boresberry of Peoria, Illinois, provided Defendant with legal advice that selling these products was legal. According to Defendant, Inman has "a background in chemistry" and Boresberry is his "family law attorney."

On April 2, 2015 — *after* Defendant was charged by indictment and arrested in the instant action — Defendant wrote a letter (Government's Exhibit 2) to Schwartz. Defendant asserts in his letter that before he consulted with Schwartz, Defendant consulted with Arthur Inman, "a lawyer from Florida," and Joe Boresberry. According to Defendant's letter, Inman "advised me I was acting legally" and Boresberry "never voiced concern." The lawyer from Florida advised Defendant to "post a sign warning against human consumption." Nowhere in the letter does Defendant claim that Schwartz told him his actions were legal.

Schwartz was asked at the instant hearing whether he had ever investigated an "advice of counsel" defense in this case. Schwartz contacted Arthur Inman, the attorney in Peoria whose name was provided by Defendant. Schwartz also contacted Tim Dandar, the attorney in Florida who advised people to put a "not for human consumption" label on the packaging. Schwartz also attempted to contact Joe Boresberry, Defendant's family attorney in Peoria. Schwartz determined that an advice of counsel defense was not "viable" with Mr. Inman. Mr. Dandar told Schwartz that he did not recognize Defendant's name. Mr. Boresberry never returned Schwartz's calls, despite leaving a couple of messages for him. Accordingly, Schwartz concluded that none of the three attorneys identified by Defendant would provide a valid advice of counsel defense.

Schwartz testified that he and Defendant did not discuss an advice of counsel defense "with regards to me." That is, because he had not advised Defendant that the substances being sold were legal or illegal, and in fact had counseled against Defendant continuing the sale of the substances, Schwartz's testimony would not provide a valid advice of counsel defense. In his affidavit (Defendant's Exhibit B), Defendant asserts that "I specifically asked Mr. Schwartz if he would be able to testify in my defense regarding the advice he previously gave me." At the instant hearing, Schwartz denied that any such conversation occurred.

According to Defendant, he sent a sample of THJ-011 to Mr. Schwartz for testing, together with a $900 money order. Defendant testified that when he followed up with Schwartz a week or two later, Schwartz told him that "the person who was testing his products quit testing them." According to Defendant, Schwartz told him in a subsequent meeting that he needed $15,000 to have testing done. Defendant asked Schwartz to return his $900.

Schwartz acknowledged that Defendant had requested Schwartz to have testing done on samples of his products. According to Schwartz, he told Defendant that "I couldn't test it." Schwartz had no recollection of a sample ever being sent to him, and testified that if he had received such a sample it "would have been destroyed." According to Schwartz, "I don't know what it would have contained and I'm not going to have something that might be an illegal narcotic in my office." Nathan Swanson, an associate in Schwartz's law firm, testified that he physically shares an office with Schwartz. Swanson testified he could not recall any discussion regarding products being sent to Schwartz for testing. According to Swanson, he would have been responsible for that type of thing and "at no time was I ever asked to have a substance tested."[5]

Regarding the "knowledge requirement" to establish a conviction, Schwartz testified that he felt the Government would "have a relatively easy time of convincing a jury of knowledge." Schwartz cited (1) an attempted undercover purchase where an employee said that Defendant removes the product from the store at night because "you never can be too careful with the raids going on"; (2) the alleged THJ-011 was ordered in emails under the heading AB-FUBINACA; (3) the texts and emails had been encrypted, creating "a fair amount of suspicion"; (4) the storage locker where most of the substances were

---

[5] While this case was pending, the Government provided samples of the product to an independent laboratory designated by Defendant. The independent lab reported that the samples came back positive for AB-FUBINACA.

7

stored was rented by Defendant in an alias as opposed to his name; (5) Defendant used cash to make purchases and pay employees; (6) the product was labeled "not for human consumption," seeming to show "deceit" on Defendant's part "when everyone knew that's exactly what people were using it for"; (7) the product was sent in separate shipments and the payments were made in separate payments "in case one got seized"; (8) "[t]here was actually a dummy box sent by a company called Mega Mulch just to see if that in fact would get through with their labeling on it"; and (9) Defendant's prior convictions for distribution of controlled substances would be introduced into evidence.

Schwartz also discussed with Defendant the concept of "willful blindness." According to Schwartz, he went over the instruction with Defendant and they "discussed what it would take and then we discussed all the factors that were involved." When speaking with Schwartz, Defendant agreed that it was in his best interest to plead guilty and "the Government could prove that he should have known what he was doing was illegal which in turn became a willful blindness based upon his actions." Schwartz opined that Defendant "knew of a high probability that his actions were illegal." That is, that the substance was regulated by federal law and Defendant "took steps or actions to avoid learning of that critical fact."

Another associate of Schwartz, T.J. Matthes, testified that he conducted research on the "knowledge requirement" and met with Defendant and Schwartz the night before the trial. Defendant had a copy of the *McFadden* opinion and "at one point we came to a disagreement with Mr. Sharp over what the government needed to show." Swanson showed Defendant the applicable language in the *McFadden* decision, and Swanson noted that Defendant had highlighted several things throughout the decision. Defendant had not highlighted, however, "one of the two prongs that the government can show knowledge by and I pointed that out to him." According to Swanson, Defendant "read it very closely and then he was just shocked. His eyes opened real wide and he said I can't believe I

didn't see that. I've read this over and over and I can't believe I've never noticed that." Swanson testified Defendant then became emotional and said "I've got to plead." At no time during any of the prep sessions or meetings with Defendant did Matthes hear him say anything about relying on legal advice given to him by Schwartz regarding the legality of THJ-011.

## V. DISCUSSION

"A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d)(2)(B). Chief Judge Reade accepted Defendant's guilty plea on October 5, 2015. Accordingly, Defendant has the burden of showing a "fair and just reason" why he should be permitted to withdraw his guilty plea. *United States v. Smith*, 422 F.3d 715, 723-24 (8th Cir. 2005) (placing the burden on a defendant to show a fair and just reason to withdraw his guilty plea). "The 'fair and just' standard is a liberal one, but it does not create an automatic right to withdraw a plea." *Id.* at 723 (citing *United States v. Wicker*, 80 F.3d 263, 266 (8th Cir. 1996)). "A guilty plea is a solemn act not to be set aside lightly." *United States v. Prior*, 107 F.3d 654, 657 (8th Cir. 1997) (citing *United States v. Morrison*, 967 F.2d 264, 268 (8th Cir. 1992)).

In this case, Defendant claims two "fair and just reasons" why he should be permitted to withdraw his guilty plea. First, Defendant argues that because his attorney had a conflict of interest, he failed to advise Defendant regarding an "advice of counsel" defense. Alternatively, Defendant asserts that a factual basis for his guilty plea was not established at the plea change hearing.

### A. Advice of Counsel Defense

In appropriate cases, a defendant may claim he acted on the advice of counsel. "However, a defendant is not immunized from criminal prosecution merely because he consulted with an attorney in connection with a particular transaction." *United States v.*

*Rice*, 449 F.3d 887, 896-97 (8th Cir. 2006). To successfully advance an advice of counsel defense, a defendant must show that he "(i) fully disclosed all material facts to his attorney before seeking advice; and (ii) actually relied on his counsel's advice in the good faith belief that his conduct was legal." *Id.* at 897. *See also United States v. Petters*, 663 F.3d 375, 384 (8th Cir. 2011).

Preliminarily, the Court notes that Defendant does *not* claim in his instant motion and supporting brief that he had a valid advice of counsel defense based on discussions with Arthur Inman, Joe Boresberry, or a "lawyer from Florida." In his letter to Schwartz dated April 2, 2015, Defendant advised Schwartz that Inman told him he "was acting legally" and Boresberry "never voiced concern." After speaking with Inman, however, Schwartz concluded that Inman could not provide a valid advice of counsel defense. Boresberry would not return Schwartz's calls, and the attorney in Florida did not recognize Defendant's name.

Rather, Defendant claims he had a valid advice of counsel defense based on Schwartz's legal advice, but Schwartz did not pursue that defense because Schwartz did not want to testify. I believe the credible evidence does not support Defendant's claim in this regard. Schwartz testified unequivocally that he never told Defendant it was legal to sell THJ-011, and in fact advised Defendant to stop selling the product. Defendant's assertion that Schwartz told him that "it would be legal to sell products containing THJ-011" is not credible. In his letter to Schwartz of April 2, 2015, Defendant cites Inman, Boresberry, and the lawyer from Florida in support of his asserted belief that his actions were legal. Notably, Defendant has not provided any document suggesting to Schwartz that Defendant was relying on Schwartz's advice regarding the legality of THJ-011. Schwartz testified that he and Defendant never discussed an advice of counsel defense based on Schwartz's testimony because there was simply no factual basis for it. I believe him.

10

The Government concedes that Defendant is entitled to conflict-free counsel. Nothing in this record supports a finding, however, that Schwartz had a conflict of interest. Between December 2013 (when Defendant first consulted with Schwartz on these matters) and April 2014 (when Defendant was arrested for violating his supervised release in Illinois), Schwartz told Defendant he did not know if THJ-011 was legal or illegal, but advised Defendant that it was "too dangerous" and he was "facing way too much time" and should stop. Defendant did not claim he relied on Schwartz's advice regarding the legality of selling THJ-011 until after the filing of a draft presentence investigation report containing an advisory guideline range of 235 to 293 months' imprisonment. Defendant's belated claim that he acted on advice of counsel, but Schwartz failed to raise the issue because of a conflict of interest, is not credible, and his motion to withdraw his guilty plea on this ground is without merit.

## B. Factual Basis for Plea

Next, Defendant argues that there was not a factual basis for his guilty pleas. It is undisputed that the substances being sold by Defendant contained AB-FUBINACA, which is a controlled substance. Defendant asserts, however, that a factual basis was not established because he believed the substance being sold was THJ-011, which is not a controlled substance.

Defendant was charged with three counts in the superceding indictment. Count 1 charged Defendant with conspiracy to manufacture and distribute a controlled substance containing AB-FUBINACA, a Schedule I controlled substance. At the plea change hearing on October 5, 2015 (the day the trial was scheduled to begin), I explained to Defendant the elements of that offense.[6] First, I explained the Government would have to prove that "two or more persons reached an agreement or understanding to distribute AB-FUBINACA, a Schedule I controlled substance." Defendant stated he understood the first

---

[6] A transcript of the plea change hearing may be found at docket number 165.

element, and then admitted such an agreement was reached. Next, I explained the Government would have to prove that he voluntarily and intentionally joined in the agreement. Defendant then admitted he "voluntarily and intentionally join[ed] in that agreement to distribute AB-FUBINACA in this district." Finally, Defendant admitted he knew when he joined in the conspiracy that "its purpose was to distribute AB-FUBINACA, a Schedule I controlled substance," the third element of Count 1. In other words, in admitting all of the elements of Count 1, Defendant admitted that he knowingly joined an agreement to distribute AB-FUBINACA. Defendant did not claim that he believed some other substance was involved.

When I addressed Defendant regarding Count 2 of the Superseding Indictment, however, Defendant stated that he believed the substance in his possession on May 7, 2014 was "something else." Count 2 of the Superseding Indictment charges Defendant with possession with intent to distribute AB-FUBINACA. The first element of that offense requires that Defendant be in possession of AB-FUBINACA in this district on May 7, 2014. Defendant admitted being in possession of AB-FUBINACA on that date. The second element requires, however, that Defendant *knew* that the substance in his possession was a controlled substance. When I asked Defendant whether he knew the substance was AB-FUBINACA, he responded: "I believed it to be something else." According to Defendant, "I didn't believe that it was a controlled substance."

I then engaged in a discussion with counsel regarding the recent decision in *McFadden v. United States*, \_\_\_\_ U.S. \_\_\_\_, 192 L. Ed. 2d 260, 135 S. Ct. 2298 (2015). The question presented in *McFadden* concerned "the knowledge necessary for conviction under § 841(a)(1) when the controlled substance at issue is in fact an analogue." 135 S. Ct. at 2302. It should be noted that Defendant here is not charged with distributing a controlled substance analogue. Accordingly, the issue in *McFadden* is not directly applicable here. Nonetheless, in addressing the "knowledge" issue in an analogue

prosecution, the Supreme Court reviewed the knowledge requirement in a controlled substance prosecution, like this one.

The Controlled Substances Act "requires a defendant to know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." *Id.* at 2304. "That knowledge requirement may be met by showing that the defendant knew he possessed a substance listed on the schedules, even if he did not know which substance it was." *Id.* Alternatively, the knowledge requirement may be met "by showing that the defendant knew the identity of the substance he possessed." *Id.* Here, Defendant denies that he knew the substance in his possession was AB-FUBINACA and, therefore, the second alternative is inapplicable. Accordingly, to lay a factual basis for Defendant's guilty plea, it was necessary for Defendant to admit that he "possessed a substance listed on the schedules, even if he did not know which substance it was."

To meet this requirement, the Government relies on the doctrine of "willful blindness."

> The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts supplying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances.

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2068-69 (2011). That is, the Government argues that while Defendant claims he did not "know" he possessed a controlled substance, he was "willfully blind" to that fact.

To establish willful blindness, "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2070. This standard "surpasses recklessness and negligence." *Id.* "Under this formulation, a willfully blind defendant is one who takes

13

deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 2070-71.

To lay a factual basis in this case, Defendant must admit that there was a "high probability" that the substance in his possession was a controlled substance, and that he took deliberate actions to avoid learning the true facts. After discussing these issues at the plea hearing, I then had the following colloquy with Defendant:

> THE COURT: Did you believe there was a high probability that those -- that substance or substances were subject to federal drug laws?
>
> THE DEFENDANT: Under some federal drug law, yes.
>
> THE COURT: And did you take deliberate action to avoid learning the true identity of the substance and whether or not, in fact, it was the subject of a federal drug law?
>
> THE DEFENDANT: By not getting it tested, yes, yes, I did.

Transcript of Plea Change Hearing (docket number 165) 19:1-11. Both Mr. Chatham and Mr. Schwartz agreed that Defendant had stated an adequate factual basis for the second element of Count 2.

Count 3 of the Superseding Indictment charged Defendant with possession with intent to distribute, and aiding and abetting the possession with intent to distribute, a substance containing a detectable amount of AB-FUBINACA, a Schedule I controlled substance. Defendant admitted at the plea hearing that he was in possession of AB-FUBINACA at Wayne Watkins' residence on May 7, 2014. I advised Defendant that the second element of Count 3 required the Government to prove that he knew he was in possession of a controlled substance. After reminding Defendant that "this goes to that whole long discussion we had about willful blindness," Defendant admitted he knew he was in possession of a controlled substance at Watkins' residence.

Defendant now claims the doctrine of willful blindness is inapplicable because he attempted to have Schwartz perform testing on the substance, and that "[t]o the extent that Mr. Sharp made any admissions regarding willful blindness, that was predicated on incorrect advice from Mr. Schwartz that failing to have the product tested was enough."[7]

I do not believe Defendant is a credible witness. I asked Defendant at the plea change hearing whether he took "deliberate action" to avoid learning the true identity of the substance and whether it was the subject of federal drug laws, and Defendant responded: "by not getting it tested, yes, yes, I did." Defendant did *not* claim at that time that he had attempted to have the substance tested by providing a sample to Schwartz. At the instant hearing, Schwartz and his two associates denied receiving any substances from Defendant for testing. Defendant admitted at the instant hearing that he knew the products he was selling were being smoked by customers to "cause a disorientation," and that he had smoked the products himself. I believe Defendant was "wilfully blind" to the fact that he possessed and was selling a controlled substance, and he truthfully admitted the elements of willful blindness at the plea change hearing. Therefore, his motion to withdraw his guilty plea on this ground is without merit.

## C. Other Factors

Other factors which may be considered by the Court in determining whether a defendant should be permitted to withdraw his guilty plea include (1) whether the Defendant asserts his legal innocence of the charge, (2) the length of time between the guilty plea and the motion to withdraw, and (3) whether the Government will be prejudiced. *United States v. Boone*, 869 F.2d 1089, 1091-92 (1989). That is, "[e]ven if such a fair and just reason exists, before granting the motion a court must consider 'whether the defendant asserts his innocence of the charge, the length of time between the guilty plea and the motion to withdraw it, and whether the government will be prejudiced

---

[7] Defendant's Brief (docket number 173-1) at 14.

15

if the court grants the motion.'" *United States v. Johnson*, 715 F.3d 1094, 1103 (8th Cir. 2013) (quoting *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826 (8th Cir. 2006)). "However, 'if the defendant fails to establish a fair and just reason for withdrawing the guilty plea, the trial court need not address the remaining considerations.'" *Id.* (quoting *United States v. Nichols*, 986 F.2d 1199, 1201 (8th Cir. 1993)).

For the reasons set forth above, I do not believe Defendant has established a "fair and just reason" to withdraw his guilty plea, as required by FEDERAL RULE OF CRIMINAL PROCEDURE 11(d)(2)(B). Accordingly, it is unnecessary to consider the "other factors" described in *Boone* and *Johnson*. I note, however, that at least two of the three factors weigh against granting the motion to withdraw. That is, the motion to withdraw was not filed until three and a half months after the guilty plea and, perhaps not coincidentally, after the draft presentence investigation report was prepared. Furthermore, if Defendant is permitted to withdraw his guilty plea, the trial would have been delayed for approximately seven months. This substantial delay prejudices the Government.

Defendant's apparent change of heart does not constitute a fair and just reason to grant his motion to withdraw his guilty plea. *United States v. Morrison*, 967 F.2d 264, 268 (8th Cir. 1992). "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about its wisdom." *Id.* (quoting *United States v. Woosley*, 440 F.2d 1280, 1281 (8th Cir. 1971)).

## *VI. RECOMMENDATION*

For the reasons set forth above, I respectfully recommend that the Motion to Withdraw Guilty Plea (docket number 173) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a*

*transcription of all portions of the record the district court judge will need to rule on the objections."* Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on February 5, 2016.

DATED this 17th day of March, 2016.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA